### A02A0758. MITCHELL v. THE STATE.
(565 SE2d 889)

MIKELL, Judge.

A jury convicted Harry Boothe Mitchell of the following offenses: two counts of homicide by vessel in the second degree, OCGA § 52-7-12.2 (b); four counts of violating the rules of the road for boat traffic, OCGA § 52-7-18 (b), (f), (g); and one count of reckless operation of a vessel, OCGA § 52-7-12.1. The trial court sentenced Mitchell to a total of four years confinement and a $1,500 fine. After the denial of his motion for new trial, Mitchell filed the present appeal, in which he challenges the sufficiency of the evidence and argues that the court erred in allowing a witness to testify to the ultimate question of his guilt, in refusing to charge the jury on the avoidance doctrine, and in sentencing him separately for offenses that merged. We disagree and affirm.

On appeal from a criminal conviction, the evidence is viewed in the light most favorable to the verdict. *Paul v. State*, 231 Ga. App. 528 (499 SE2d 914) (1998). We do not weigh the evidence or determine witness credibility but only determine whether the evidence is sufficient under *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979). The verdict must be upheld if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Williams v. State*, 233 Ga. App. 217 (1) (504 SE2d 53) (1998).

So viewed, the record shows that on August 14, 1999, Mitchell was operating a 32-foot Marinet cruiser (the "Marinet") on Lake

---

[12] Id. at 609 (2).
[13] (Punctuation omitted.) Id. at 610 (2).
[14] Id.

Lanier with three passengers on board. The boat belonged to Mitchell's wife, Barbara Holland, who was one of the passengers. There was no evidence of the vessel's precise speed; however, Mitchell told a law enforcement officer that the Marinet's engines were operating at 2,200 rpm.

A smaller ski boat owned by Brian Carringer was also on the lake that day. Carringer was accompanied on the boat by his fiancée, Kelly Rocks; her father, Richard Rocks; Richard's wife, Patricia; Richard's son, Greg; and Greg's fiancée, Jennifer. At the time in question, Carringer had stopped his boat so that Richard Rocks could climb back into it after unsuccessfully attempting to water ski. One of Richard's skis floated away, and Carringer jumped into the water to retrieve it. The ski had drifted approximately 15 to 20 yards away from the boat. While he was retrieving the ski, Carringer and the other passengers noticed the Marinet approaching their boat from a distance of approximately 300 to 400 yards. As the Marinet came closer, the passengers on the ski boat became concerned that the driver of the Marinet did not see them. They began waving their arms and yelling in an attempt to get his attention. Carringer was still in the water, approximately 15 yards from his boat. Greg Rocks attempted to start the ski boat's engine to move it out of the Marinet's path, but he could not get it started. It appeared that the Marinet was going to collide with the ski boat, so the smaller boat's passengers began jumping into the water. Richard Rocks jumped into the path of the Marinet and appeared to be struck by the cruiser as he entered the water.

Richard floated to the surface because he was wearing a life vest. Carringer and Patricia Rocks saw Richard and observed a large amount of blood in the water around him. Carringer called out to Greg that his father was injured, and Greg swam over to Richard. Unbeknownst to him, Greg had started the engine of the ski boat before jumping overboard, and it began running in circles with no one on board until it ran ashore. The boat did not come into contact with any of the people in the water or with another vessel. Once outside of the path of the circling ski boat, the Marinet stopped, and Jerry Highland, a passenger, called 911.

In the meantime, two boys on jet skis arrived at the scene, and Greg used one of the jet skis to carry Richard to the Marinet. After Richard was lifted onto the boat's swim platform, the Marinet proceeded to the Athens Boat Club, where an ambulance waited. Several minutes after Richard was placed in the ambulance, an emergency medical technician told Patricia that her husband had died.

Officer Melvin Dale Clayton of the Georgia Department of Natural Resources interviewed Mitchell at the scene. After waiving his *Miranda* rights, Mitchell told Officer Clayton that he was operating

the Marinet at the time of the accident and that he had been looking over his shoulder at some jet skis behind his boat and did not see the ski boat or Richard Rocks. He was arrested approximately one year later.

1. First, Mitchell contends on appeal that there was insufficient evidence to support his conviction for Counts 1 and 3. Count 1 charged him with homicide by vessel in the second degree. OCGA § 52-7-12.2 (b). Count 3 contained the predicate offense for that homicide charge, accusing Mitchell of violating Rule 18 of the Steering and Sailing Rules adopted in OCGA § 52-7-18 (b) by failing to keep the Marinet out of the way of Carringer's boat while it was not under command. We conclude that there was ample evidence to support the convictions on both charges.

The evidence adduced at trial and summarized above demonstrates that Mitchell was operating a power-driven vessel which was underway; that Carringer's boat was not under command at the time of the accident; and that Mitchell failed to keep the Marinet out of the way of the ski boat. In fact, the Marinet was headed directly toward Carringer's boat, when the passengers were forced to jump into the water. Carringer testified that had Greg not started the ski boat's engine before jumping, the Marinet would have collided with it. Contrary to Mitchell's argument, there was evidence of a violation of OCGA § 52-7-18 (b) despite the fact that the two boats did not actually collide. Mitchell has failed to point to any statute or case law that requires an actual collision in order to convict a defendant of violating the rules of the road for boat traffic, and our research reveals none.

We also reject Mitchell's contention that Rule 18 of the Steering and Sailing Rules, as adopted in OCGA § 52-7-18 (b), does not apply to this case because the victim's boat was not moving. The language of the rule requires a vessel that is "underway" to stay out of the way of a vessel that is "not under command." There is no requirement that the second boat be underway. Vessels not under command may be adrift.

Further, contrary to Mitchell's argument, the existence of OCGA § 52-7-18 (d) does not affect his conviction under subsection (b) of that Code section. Subsection (d) provides that "[p]owered vessels approaching nonpowered vessels shall reduce their speed so that *their wake* shall not endanger the life or property of those occupying the nonpowered vessel." (Emphasis supplied.) It was not alleged that the wake from the Marinet caused Richard's death, but that the near-collision between the boats caused Richard to evacuate the ski boat and jump into the path of the Marinet.

Accordingly, there was sufficient evidence to support Mitchell's conviction of violating the rules of the road for boat traffic under

OCGA § 52-7-18 (b). Because the evidence shows that Mitchell's violation of that provision caused Richard's death, his conviction of homicide by vessel in the second degree must be affirmed, as well. OCGA § 52-7-12.2 (b).

2. Next, Mitchell challenges the sufficiency of the evidence in connection with his convictions for Counts 2 and 4. Count 4 charged him with violating the rules of the road for boat traffic by operating a vessel above idle speed within 100 feet of Richard Rocks while he was in the water. OCGA § 52-7-18 (f). Count 2 accused Mitchell of homicide by vessel in the second degree because his violation of that rule caused Richard Rocks' death. OCGA § 52-7-12.2 (b). Again, we find that the evidence was sufficient to support both convictions.

OCGA § 52-7-18 (f) provides, in pertinent part: "No person shall operate any vessel . . . on the waters of this state at a speed greater than idle speed within 100 feet of any . . . person in the water." There was evidence that Mitchell was operating the vessel in question; that the Marinet was traveling at a speed greater than idle; and that it was within 100 feet of Richard Rocks while he was in the water and actually ran over him.

Mitchell argues that his convictions under Counts 2 and 4 cannot stand, because Richard was not in the water until after the Marinet was already within 100 feet of him. We reject this argument. First, there is no language in the statute or case law that requires that the person be in the water before the vessel comes within 100 feet of him. Furthermore, it was Mitchell's action in driving the Marinet directly at the ski boat that caused Richard to jump into the water. The jury rejected Mitchell's justification defense and concluded that the evidence was sufficient to convict him of these charges, and we find no reason to disturb that verdict.

3. Mitchell contends that the offenses contained in Counts 4 and 6 merged; therefore, the two convictions cannot stand, and the court erred in sentencing him separately. We disagree and affirm.

As we noted above, Count 4 charged Mitchell with violating OCGA § 52-7-18 (f) by operating the Marinet above idle speed within 100 feet of Richard Rocks while he was in the water. Count 6 charged him with violating the rules of the road for boat traffic by operating his vessel above idle speed within 100 feet of Carringer while he was in the water. Mitchell argues that the two offenses merged because the Marinet was within 100 feet of both men at the same time. We conclude that the offenses did not merge as a matter of law or fact.

OCGA § 16-1-7 (a) prohibits multiple convictions for the same conduct; however, here the two offenses involved different conduct. Specifically, Count 4 required proof that Mitchell drove the Marinet within 100 feet of Richard, while Count 6 required proof that he drove within 100 feet of Carringer. Further, in proving one offense,

the state did not "use up" evidence necessary to prove the other. See *Brown v. State*, 246 Ga. App. 60, 64 (1) (539 SE2d 545) (2000); OCGA § 16-1-6 (1). Accordingly, the two offenses did not merge.

4. Mitchell also contends that the offenses charged in Counts 3 and 7 merged for sentencing purposes and that the trial court erred in sentencing him separately for the two counts. Again, we find no harmful error and affirm.

Count 3 alleged that Mitchell violated OCGA § 52-7-18 (b) by failing to keep his vessel out of the way of a vessel not under command. Count 7 accused Mitchell of violating OCGA § 52-7-18 (g) by operating a vessel within 100 feet of another vessel at a speed greater than idle speed when his vessel was not overtaking or meeting the other vessel.

As noted above, OCGA § 16-1-7 (a) prohibits multiple convictions for the same conduct, but the two offenses at issue here involve different proscribed conduct, and each crime has distinctive elements which distinguish it from the other. See *Bogan v. State*, 177 Ga. App. 614, 617 (2) (340 SE2d 256) (1986). Count 3 required proof that Carringer's boat was not under command and that Mitchell failed to keep out of that boat's way. Count 7 required proof that Mitchell exceeded idle speed while within 100 feet of Carringer's boat. Thus, the offenses as charged were separate and distinct.

However, we must also consider whether the offenses merged as a matter of fact.

> As with any factual merger question, the dispositive issue is whether the State "used up" its evidence in proving the crime: "The actual evidence test, in effect, means that if the state uses up all the evidence that the defendant committed one crime in establishing another crime, the former crime is included in the latter as a matter of fact under OCGA § 16-1-6 (1)."

*Brown*, supra at 64 (1), citing *Montes v. State*, 262 Ga. 473, 474 (1) (421 SE2d 710) (1992). We conclude that the state "used up" the evidence that would establish Mitchell's guilt for Count 7 in proving Count 3. There was no evidence that Mitchell operated the Marinet within 100 feet of Carringer's boat at any time other than when it was not under command. Therefore, the offenses merged as a matter of fact. While a defendant may be tried for both offenses under such circumstances, he may not be sentenced for both. *Chadwick v. State*, 236 Ga. App. 199, 202 (3) (511 SE2d 286) (1999).

However, any error was harmless, because Count 3 merged with Count 1 for sentencing purposes, and Mitchell received no separate sentence for Count 3. Mitchell does not argue that the court erred in

sentencing him separately for Counts 1 and 7. Thus, the sentence is valid.

5. Mitchell contends that the trial court committed reversible error by overruling his objection to the testimony of Mike Burgamy, when, in response to the prosecutor's question as to his characterization of the manner in which Mitchell operated the Marinet on the date in question, the witness responded: "I would say he had a reckless disregard for safety." Count 5 of the indictment charged Mitchell with "operating a vessel in reckless disregard for the safety of persons and property." Therefore, Mitchell argues that the court erred in allowing the state's witness, a boat safety officer with the Georgia Department of Natural Resources, to testify as to the ultimate issue of Mitchell's guilt. We find no error.

Mitchell is correct that generally witnesses are not permitted to express their opinions regarding an ultimate issue in a case, because to do so would invade the factfinding province of the jury. *Medlock v. State*, 263 Ga. 246, 248 (3) (430 SE2d 754) (1993). However, in this case, the court did not overrule Mitchell's objection to the testimony. Immediately following the objection, the court asked the prosecutor if he wished to respond. The prosecutor said that he would ask the witness to rephrase the answer, and he posed the following question to Burgamy: "Don't use legalese terms. How would you characterize in layman's terms how the Defendant was operating his boat?" Burgamy answered by describing in detail the manner in which Mitchell was operating the boat and the hazards he created. Mitchell objected to Burgamy's answer on hearsay grounds but did not renew his objection that the testimony went to the ultimate question of guilt. Significantly, Mitchell did not object to the rephrased question, move for a mistrial, or request a curative instruction. "When an appellant could have tendered a timely motion for mistrial or requested additional limiting or curative instruction but declined to do so, we generally will not grant more appellate relief than that actually prayed for at trial." (Citations, punctuation and footnote omitted.) *Pena v. State*, 247 Ga. App. 211, 216 (1) (542 SE2d 630) (2000).

Mitchell argues that we should apply the plain error doctrine. See *Almond v. State*, 180 Ga. App. 475, 480 (349 SE2d 482) (1986). The Supreme Court has applied that analysis only to death penalty cases and criminal cases where the trial judge improperly intimated his or her opinion in violation of OCGA § 17-8-57. *Paul v. State*, 272 Ga. 845, 848-849 (3) (537 SE2d 58) (2000). Clearly, the case sub judice does not fall into either category. We have applied the plain error doctrine more broadly, however. See id.; *Almond*, supra.

This Court generally refuses to address issues not raised or ruled upon below. An exception exists, however, in cases of

plain error which is so clearly erroneous as to result in a likelihood of a grave miscarriage of justice or which seriously affects the fairness, integrity or public reputation of a judicial proceeding.

(Punctuation and footnotes omitted.) *Rogers v. State*, 253 Ga. App. 675, 676 (2) (560 SE2d 286) (2002).

We cannot conclude that plain error existed in this case. The witness inadvertently responded improperly to one question. Upon Mitchell's objection, the state immediately rephrased the question and elicited a different response. The improper testimony did not rise to the level of resulting in "a likelihood of a grave miscarriage of justice," nor did it "seriously affect[ ] the fairness, integrity or public reputation of a judicial proceeding." (Punctuation and footnote omitted.) *Rogers*, supra. Furthermore, even if the court had erred in not providing a curative instruction, sua sponte, any error would be harmless in light of the overwhelming evidence of Mitchell's guilt.

6. Next, Mitchell contends that the court erred in refusing to give his requested jury instruction on the avoidance doctrine. Specifically, he argues that a jury issue existed regarding whether Richard could have avoided the consequences of Mitchell's negligence by jumping to safety as the ski boat's other occupants did.

This enumerated error presents nothing for review, however, because the requested jury charge at issue is not included in the record. "The appellant bears the burden of showing error affirmatively by the record. We will not presume error from a silent record." (Punctuation and footnotes omitted.) *In re Ray*, 248 Ga. App. 45, 46 (1) (545 SE2d 617) (2001).

Furthermore, during the charge conference, the trial court stated that it did not believe Mitchell's requested charge on the avoidance doctrine was adjusted to the evidence and pointed out that it was a charge suggested for use in civil cases. In refusing to give the requested charge, the trial court relied on the case of *Whitener v. State*, 201 Ga. App. 309 (410 SE2d 796) (1991), in which we held:

So long as the defendant's negligence proximately caused the death of another, the crime has been committed, even if there are other factors which also are proximate causes of the death. As opposed to the civil context, in which compensating deserving victims is the aim, in the criminal context it simply is not relevant that the victim was negligent, unless the defendant's conduct did not substantially contribute to the cause of death.

(Citations and punctuation omitted.) Id. at 311 (3). The evidence that Mitchell's conduct substantially contributed to Richard's death was overwhelming.

The jury charge given by the court, taken as a whole, was a correct statement of the law and was adjusted to the evidence. See *Hoang v. State*, 250 Ga. App. 403, 410 (3) (551 SE2d 813) (2001). The court instructed the jury on the general principles of the presumption of innocence, reasonable doubt, witness credibility, circumstantial evidence, intent, accident, and proximate cause, as well as the specific charges against Mitchell. Accordingly, we find no error.

7. Mitchell argues in his brief that the court erred in not certifying Highland as an expert witness in the area of boating safety. However, this assertion is not raised anywhere in the enumeration of errors. "[A]n enumeration of error cannot be enlarged by a brief to give appellate viability to an issue not contained in the original enumeration. Thus, this issue is not preserved on appeal." (Citations and punctuation omitted.) *Unden v. State*, 218 Ga. App. 463, 466 (5) (462 SE2d 408) (1995). Furthermore, it is not clear that Mitchell preserved this issue during the trial. The state objected to Highland being qualified as an expert witness. Counsel for Mitchell and the state approached the bench, where the court told them, outside of the hearing of the jury, that it was not inclined to certify Highland as an expert. The court offered to announce its ruling for the record, but defense counsel stated that he would withdraw the question which prompted the state's objection. Accordingly, we find that Mitchell's argument presents nothing for our review.

Even if Mitchell had properly preserved this issue for appeal, an enumerated error on this ground would not have been successful. "It is a matter within the sound discretion of the trial judge as to whether a witness has such learning and experience in a particular art, science or profession as to entitle him to be deemed prima facie an expert." (Punctuation and footnote omitted.) *Yount v. State*, 249 Ga. App. 563, 564-565 (1) (548 SE2d 674) (2001). Our review of the witness' qualifications does not indicate that the trial court abused its discretion.

*Judgment affirmed. Andrews, P. J., and Phipps, J., concur.*

DECIDED MAY 30, 2002.

*Leo E. Benton, Jr.*, for appellant.
*Jerry Rylee, Solicitor-General, Larry A. Baldwin II, Assistant Solicitor-General*, for appellee.